**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILNER PIERRE** | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | |
| **POLICE OFFICER MCCOLGAN, et al.,** | : | **No.  19-5835** |
| *Defendants*. | : | |

**MEMORANDUM**

When Defendants Officer Alyssa Hanley (now Sergeant Hanley) and Officer Francis

McColgan pulled Plaintiff Wilner Pierre's vehicle over for having a non-functioning brake light

around midnight in the Kensington area of Philadelphia, they found him with his pants down just

above his knees and on backwards.  After Pierre claimed the situation was not weird and reached

down inside of his pants after he had been ordered to pull his pants up, the officers ordered him

out of his car to be frisked.  When he did not fully comply with orders and continued to offer

answers they found suspicious, they handcuffed and detained him in the back of a patrol car for

roughly 11 minutes while they frisked his vehicle, ran his information, and wrote him a ticket for

his non-functioning break light.  Pierre brings a 42 U.S.C. § 1983 claim for unlawful search and

seizure and state-law claims for false arrest and false imprisonment against Defendants Officer

Francis McColgan and Sergeant Alyssa Hanley.  The Defendants seek summary judgment on

both counts.

**I.      FACTS[1]**

---

[1] The following facts derive from the parties' deposition testimony and camera footage from
Officer McColgan's and Sergeant Hanley's body cameras, which the Court finds extremely
helpful to its review.  The Court notes disputed facts where they exist, but when a party provides
deposition testimony that is directly contradicted by video footage, the Court does not include
those and instead views the "facts in the light depicted by the videotape." *Scott v. Harris*, 550
U.S. 372, 380-81 (2007).  Additionally, the court does not view factual disputes as genuine when

On the evening of June 23, 2018, Wilner Pierre was heading home from a family barbecue, and had previously pulled over to urinate in an alleyway. *See* No. 19-cv-5835, ECF No. 14-5, Ex. C Pierre Deposition (Pierre Depo.) at 7:9-19; 9:17-19. *Id.* at 7:19, 9:17-19. When he got back in the car, he was uncomfortable because his air conditioning was not working, so he pulled his pants down, opened his car window, and continued driving home. *Id.* at 7:20-23, 11:17-12:1. He then took his pants off completely and removed his shoes. *Id.* at 15:8-11, 12:2-4.

Just before midnight and around the 3500 block of Kensington Avenue in Philadelphia, Defendants Officer McColgan and Sergeant Hanley (then Officer Hanley) pulled Wilner Pierre's vehicle over for having a non-functioning rear brake light. *See* Stipulated Facts, ECF. No. 14 ("Stip."), at ¶ 8; *see also* ECF No. 14-3, Ex. A, McColgan Deposition (McColgan Depo.) at 10:5-7; *id.* Ex B, Hanley Deposition (Hanley Depo.) at 10:2-5; Stip. at ¶ 9. Kensington Avenue is a known location where people frequently prostitute themselves. *See* Pierre Depo. at 40:23-41:13. Pierre testified that he was not soliciting a prostitute that evening. *Id.*

Before the officers approached Pierre's car, Pierre began putting his pants back on, but he put them on backwards. *Id.* at 15:1-6; 89:21-90:1-4. Officer McColgan, who has been on the force for approximately three and a half years, *see* McColgan Depo. at 5:19-21, approached Pierre's car on the driver's side, *see* McColgan Footage at 00:20-24. Sergeant Hanley, who has worked for the Philadelphia Police Department for over five years, *see* ECF No. 14-4, Ex. B. at 5: 16-18, approached on the passenger side of Pierre's car, *see* McColgan Footage at 00:32.[2]

---

the disputing party merely puts forward a rationale for the occurrence, contests the import of the occurrence, or makes a conclusory statement. Such purported factual disputes are not included in this recitation.

[2] The parties agree that Officer McColgan's body camera captured most of his interaction with Pierre, and that Sergeant Hanley's body camera captured part of the interaction. *Id.* ¶¶ 10-11.

When Officer McColgan shined a flashlight into Pierre's car, he found Pierre sitting in his car with a cellphone in his right hand, nothing in his left hand, and his pants down, with the waistband a few inches above his knees.  The driver's window was also rolled down slightly. *See* McColgan Footage at 00:24-00:26.

Officer McColgan stated "Hold up. What are you doing, man? You taking your pants off?" *Id.* at 00:30-00:35.  Pierre rolled down his window further, cell phone still in hand, and replied "oh no, no no, actually, I was just, I was just talking to my friend on the phone. . ." *Id.* at 00:35-00:39.  Officer McColgan then ordered Pierre to "turn [sic] your seatbelt off, take your seatbelt off." Pierre replied, "What?" Officer McColgan asked Pierre what was going on, and Pierre replied saying, "Nothing is going on," while he went to turn the ignition off.  *Id.* at 00:43-00:45.  Officer McColgan again said "Seatbelt, take it off. Pull your pants up."  *Id.* at 00:45-00:47.  Pierre dropped his phone out of his left hand, reached over with that hand to take off his seatbelt, then immediately reached into his pants with his left hand.  *Id.* at 00:47-00:48.[3]

When Pierre put his hand into his pants, Officer McColgan asked "What are you – you just try to put something in your pants?" *Id.* at 00:48-49.  Pierre responded "Nah, nah nah nah, actually, uh, I was talking to my friend on the phone and my friend told me . . ." *Id.* at 00:51-00:55.  Throughout this interaction, Pierre's left hand was still in his pants.  *Id.* at 00:48-00:55.  In the footage, Pierre can be seen leaning slightly forward with the left side of his body, rustling the material of his right pant leg with his left hand from the inside of his pants – pulling the material downward – and lifting up his right leg.  *Id.* at 00:48-00:50.  Pierre characterizes this

_____

Officer McColgan's body camera captures the initial interaction.  *See* ECF No. 14-6, Ex. D., Officer McColgan's Body Camera Footage ("McColgan Footage").

[3] Pierre characterizes this interaction as Officer McColgan interrupting Pierre's explanation of what was going on, followed by Pierre immediately complying with the officer's directives but being confused by a quick succession of conflicting orders. *See*, *e.g.*, ECF No. 15-1 at ¶ 20.

behavior as a clear attempt to pull his right leg out of the pants in order to take them off and put them on correctly.

At this point, Officer McColgan opened Pierre's driver seat door and commanded Pierre to get out.  *Id.* at 00:55-00:57.  Pierre responded, "Huh?"  *Id.* Officer McColgan again said, "Step out."  *Id.*  Pierre asked why.  *Id.* at 00:58-59.  Officer McColgan then said, "Put your pants on."  *Id.* at 00:55-00:59. And then, "'Cause people don't ride around with no pants."  *Id.* at 00:59-1:01.

Officer McColgan testified that he asked Pierre to step out of the vehicle because of Pierre's state of dress and Pierre's actions of reaching toward the floor where his pants were located.  *See* McColgan Depo. at 10:11-20.  Sergeant Hanley testified that she agreed with this decision because Pierre was making a lot of movements within his car and not following commands, which led them to believe he may have an object that was a threat to their safety.  *See* Hanley Depo. at 11:9-15, 12:6-14, 31:23-32:14.

Pierre then explained, "No, I'm not riding around with no pants.  Actually, I just got out from using the restroom and then I put my . . ."  *Id.* at 01:00-01:07.  Officer McColgan then pointed out that "your pants are on backwards."  *Id.* at 01:08-01:10.  Pierre responded, "No!," and Officer McColgan said, "yes, they are."  *Id.*  Pierre, who had been taking his pants off during this interaction, turned them around and began to put them on the correct way.  Officer McColgan asked Pierre, "What did I just miss?" *Id.* at 01:14-01:16.  Pierre replied, "Nothing." *Id.* at 01:16.  Officer McColgan repeated that "I missed *something*," *id.* at 01:19, and Pierre claimed that "no, no, you didn't miss anything." *Id.* at 01:20.

After Pierre completed removing his backward pants and began putting them on correctly, Officer McColgan commented to Pierre that "This is weird, right?  *Id.* at 01:16-24.  Pierre responded, "What weird?"  *Id.* Officer McColgan reiterated that "this is weird."  *Id.* at

01:24.  Pierre responded, "What?"  *Id.* Officer McColgan replied, "like we can agree that this is weird."  *Id.* at 01:31-01:32.  Pierre responded that "No, this is nothing weird."  *Id.* at 01:26-01:29.  Officer McColgan then asked if Pierre was drunk.  *Id.* at 01:30-01:32.  Sergeant Hanley asked Officer McColgan if Pierre was high.  *Id.* at 01:32.  Pierre said he was not, and Officer McColgan replied that no, his eyes were fine.  *Id.* Officer McColgan reiterated his command for Pierre to "step out. Put your shoes on and step out" and that he didn't want Pierre stepping on anything on the street.  *Id.* at 01:34-01:37.

Pierre began to step out the car once he finished putting his pants on, but Officer McColgan cautioned again to "put your shoes on" because the road is not clean.  *Id.* at 01:35-01:50. Pierre put one shoe on, put his foot on the ground and began to step out, when Officer McColgan said to put both of his shoes on.  *Id.*  Pierre, still in the vehicle, asked "Why do you want me to step out?"  *Id.*  Officer McColgan replied, "both of your shoes."  Pierre asked again, "Why do you want me to step out?  *Id.* at 01:51-01:53.  Officer McColgan then said, "Step out, you don't want to listen.  I was going to save you.  Step out."  *Id.* at 01:53-01:56.  Pierre replied, "No, no, no, no."  *Id.* at 01:56-01:59.

Taking a step back away from the car, Officer McColgan said "out of the car. To the back. Out of the car, to the back.  Back."  *Id.* at 01:56-02:03.  Sergeant Hanley walked around the front of the vehicle and told Pierre that "[w]e are allowed to conduct a car stop with you out of the vehicle.  We are legally allowed to ask you to get out of the vehicle."  *Id.* at 01:56-02:05. Pierre stepped out of the car and was looking at Sergeant Hanley while she was speaking.  *Id.* at 02:03-02:05.  Before she finished speaking, Officer McColgan tapped Pierre's left arm and said, "let's go."  *Id.* at 02:05.  Pierre continued talking, saying "I just want to know why I'm stepping

out." *Id.* at 02:06-02:08. He then turned to close the driver's door, Sergeant Hanley said she would get the door, and Pierre walked to the back of the vehicle. *Id.* at 02:12-02:15.

Officer McColgan said to Pierre, "Back here. Hands, back here. Hands, Right there. What do you got on you? Hands! Right there. Turn around. What do you got on you?" *Id.* at 02:05-02:17. During this period, Pierre reached the back of the vehicle and put his hands on the hood of the trunk. *Id.* Officer McColgan was behind him, and Sergeant Hanley stood next to the side rear of the car. *Id.* at 02:17. Pierre said "nothing," and turned toward Officer McColgan, lifting his arms off the trunk of the vehicle and in the air as he did so. *Id.* at 02:19. Officer McColgan again told Pierre to put his hands on the hood. *Id.* at 02:18-02:20.

Officer McColgan began to pat down Pierre's right leg, asking if Pierre had any weapons on him. *Id.* at 02:21-02:23. Pierre responded that he did not. Officer McColgan did not recover any weapons from Pierre's person, Stip. at ¶ 15, but he testified that Pierre was "passively resisting" the frisk by tens[ing] up." McColgan Depo. at 11:23-12:3.

As Officer McColgan was frisking Pierre, Sergeant Hanley asked why he did not have any pants on while he was driving around. *Id.* at 02:25-02:28. Pierre replied that he had just used the restroom and that he was talking on the phone. *Id.* at 02:28-02:30. Officer McColgan said, "What, you peed in the car?" *Id.* at 02:30-02:32. There was no audible response for a few seconds, at which point Officer McColgan said "Yo, he's gonna sit," and Sergeant Hanley said, "go ahead." *Id.* at 02:34-02:35. Pierre then said "I wasn't peeing." *Id.* at 02:36-02:37.

Sergeant Hanley testified that she agreed with Officer McColgan's decision to handcuff Pierre because it was for their safety. Hanley Depo. at 21:12-14. Officer McColgan also testified that they handcuffed Pierre so they could conduct a frisk of his car where he was immediately reaching. McColgan Depo. at 12:21-12:24.

Officer McColgan then told Pierre to put his hands behind his back. *Id.* at 02:37-02:39. He reiterated the command twice. *Id.* Pierre turned slightly toward Officer McColgan, lifting his hands slightly from the trunk, and asked "why do you want to arrest me for?" *Id.* at 02:42-02:43. Officer McColgan told him that he was not under arrest, but under investigation. *Id.* at 02:44-02:45. Officer Hanley also told him he was not under arrest. *Id.* At this time, Pierre was still turned slightly toward Officer McColgan. *Id.* Officer McColgan had his handcuffs in his right hand, took Pierre's right wrist in his left hand, and guided it toward Pierre's back. *Id.* at 02:46-02:47. Pierre turned further toward Officer McColgan and began pulling his right arm back, away from Officer McColgan, and said "Investigate me for what?" *Id.* at 02:44-02:46.[4] Officer McColgan put his right hand on Pierre's chest, and asked "Am I gonna have to slam you?" *Id.* at 02:46-02:48, while Sergeant Hanley moved closer to Officer McColgan and Plaintiff and said, "Yo, dude." *Id.* Pierre then said, "Ok, all right, all right."

Officer McColgan's body camera then fell onto the ground, *id.* at 02:49-02:50, and the parties dispute how this occurred. Officer McColgan testified that Pierre's right arm came up and knocked his camera off his chest, and that he thought Pierre was getting ready to fight him. McColgan Depo. At 12:6-10. Officer McColgan also testified that he had been in 10-12 fights with civilians on the job in Kensington. *Id.* at 16:2-8. Later in the traffic stop, Officer McColgan told Pierre that he was handcuffed because "you threw an arm, buddy." McColgan Footage at 10:45-10:59. Pierre claims Officer McColgan brushed his chest against Pierre's elbow as he was handcuffing him, causing the camera to fall to the ground. Plaintiff's Statement of Undisputed Material Facts, ECF No. 15, at ¶ 31. Pierre supports this version of events by

---

[4] Pierre states that he did not pull his arm away. *See* Pl. Response to Def. Statement of Undisputed Material Facts, ECF No. 15-1 at ¶ 72. Because the video footage clearly shows he did, the Court does not find a genuine dispute as to this matter.

Officer McColgan's later statement during the traffic stop that the body camera "comes off with the slightest swipe. Amazing." *Id.* at ¶ 103 (quoting McColgan Footage at 09:40).

From the camera's vantage point on the ground, Officer McColgan can be seen handcuffing Pierre. McColgan Footage at 02:50-02:55. Sergeant Hanley put the bodycam on the hood of the car, where it remained for about 50 seconds. *Id.* at 02:58-03:48. Officer McColgan and Pierre can be heard talking in the background for about 40 seconds, and 10 seconds later Officer McColgan put his bodycam back on and joined Sergeant Hanely. *Id.* at 03:48 – 03:50.

Sergeant Hanley was leaning into Pierre's driver's side with her upper body and flashlight. *Id.* at 03:49-03:51. Officer McColgan asked whether she had found anything, and she said she had not. *Id.* at 03:54-03:55. The officers concluded that Pierre had urinated in a water bottle inside the driver door cupholder. *Id.* at 03:55-03:58. Pierre later testified that it was not urine in the bottle but rather yellow pre-workout vitamins. *See* Pierre Depo., ECF No. 14-4, Ex. C. at 27:16-18. After concluding that Pierre had urinated in the bottle, Sergeant Hanley asked why Pierre would have pulled his pants so far down that he then put them on backwards, and Officer McColgan responded that he had no idea. McColgan Footage at 03:58-04:05.

Sergeant Hanley continued looking into the driver door console and Officer McColgan shined a flashlight into the car. *Id.* at 04:05-04:08. Officer McColgan asked if Pierre had his ID, because it was not on Pierre's person. *Id.* at 04:08-04:09. Officer Hanley leaned back into the car through the driver's door, opened the center console, and handed an ID to Officer McColgan. *Id.* at 04:08-04:15. Officer McColgan took the ID and walked back to the patrol car. *Id.* at 04:15-04:22. On the way, Officer McColgan asked whether there was any registration in the car,

and Sergeant Hanley responded that there was.  *Id.* at 04:22-04:30. Sergeant Hanley then got out

of Pierre's car.  *Id.* at 04:30.

Sergeant Hanley testified that Pierre remained in handcuffs even after the frisk of Pierre's

person and vehicle discovered no weapons because they believed he was still a threat to the

officers or to himself because he "threw an elbow" at Officer McColgan and was acting

erratically.  Hanley Depo. at 32:15-32:22, 33:2-8; 34:2-9.  She testified that she did not "know

what he had on his person, or in his vehicle, nor . . . his mental state."  *Id.*  She also testified that

he was put in the patrol car rather than left in his car or in the street for both his safety and theirs,

*id.* at 22:10-18, 33:9-14, and that they did not permit him to stand on the sidewalk instead of

sitting in the patrol car so that one officer was not left alone with him while the other completed

the paperwork from inside the patrol car.  *Id.* at 33:18-34:1.

Officer McColgan got back into the patrol car and began entering Pierre's information

into the computer. *Id.* at 04:45-05:30.  Sergeant Hanley also got back into the patrol car.  *Id.*

Pierre asked why he was stopped, and Officer McColgan told him he had a break light out,

"that's all it was." *Id.* at 05:01-05:05.  Officer McColgan continued entering Pierre's

information into the computer. *Id.* at 05:05-06:19.  Pierre continued to argue with Sergeant

Hanley about whether Pierre was acting weird by driving around without any pants on. *Id.* at

05:15-05:50.  As he was entering information in the computer, Officer McColgan told Sergeant

Hanley that "you can write him a ticket. I don't give a sh*t. He just got no pants." *Id.*  She

agreed, and got out of the patrol car to get a ticket book from the trunk. *Id.* at 05:52-05:56.

Pierre and Officer McColgan began disputing whether Officer McColgan had searched

Pierre's car. *Id.* at 06:04-06:09.  From behind the car, Sergeant Hanley said that "you can't just

drive around [expletive] Kensington naked. It doesn't work like that."  ECF No. 14-7, Ex. E,

Hanley Bodycam Footage at 02:00-02:06.  Officer McColgan helped Sergeant Hanley locate a ticket book in the trunk, and then both officers got back into the patrol car. *Id.* at 06:19-07:06.

Sergeant Hanley spent the next six minutes writing Pierre a ticket.  *Id.* at 07:06-13:22. Pierre and Sergeant Hanley periodically continued to dispute the officers' authority to handcuff Pierre and place him in the police car.  *Id.*  The officers again explained that he was not under arrest.  *Id.* at 11:01-11:02.

When Sergeant Hanley finished writing the ticket, the officers got out of the patrol car, let Pierre out, and removed his handcuffs.  *Id.* at 13:22-14:01.  Pierre accused the officers of harassment, requested their badge numbers, and said they were racist.  *Id.* at 13:35-14:04. Sergeant Hanley then handed Pierre his ticket and told him he was free to go.  *Id.* at 14:01-14:04. Pierre later filed a complaint with Internal Affairs.  Stip. at ¶ 21.  He also attempted to fight his ticket but was ultimately required to pay it.  Stip. at ¶ 20.

Pierre was unsuccessful in his Internal Affairs review, and filed the instant lawsuit.  After completing discovery, Defendants filed a motion for summary judgment on both counts.  That motion has been fully briefed, argued before the Court on January 25, 2021, and is ripe for the Court's resolution.

## II.    LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears an initial burden of proving a lack of any genuine issue of material fact.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 & n. 10 (1986).  After that burden is met, the nonmoving party must "come forward with specific facts showing there is a genuine issue for trial."  *Id.* (internal citations and quotation marks omitted).  A factual dispute is

"material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

All facts "should be viewed in the light most favorable to the non-moving party, with all reasonable inferences [drawn] in that party's favor." *Jutrowski*, 904 F.3d 280, 298 (3d Cir. 2018) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006) (internal quotation marks omitted)). Summary judgment is proper when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In qualified immunity cases, facts are viewed in the light most favorable to the non-moving party, which usually means adopting the plaintiff's version of events. *Scott v. Harris*, 550 U.S. 372, 379 (2007). But when a video of the events exists, courts view facts in "the light depicted by the video." *El v. City of Pittsburgh*, 975 F.3d 327, 338 (3d Cir. 2020).

## III.   DISCUSSION

Pierre sues Officer McColgan and Sergeant Hanley for violating his Fourth Amendment right to be free from unlawful searches and seizures and for false arrest and false imprisonment under Pennsylvania tort law. The Court will address each in turn.

### A.  1983 Claim

"Police officers, embodying the authority of the state, are liable under [42 U.S.C.] § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). In such cases, the Court must ask "(1) whether the officer violated a constitutional right, and (2) whether the right was clearly

established, such that it [would have] been clear to a reasonable officer that his conduct was

unlawful." *El*, 975 F.3d at 334 (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011)

(internal quotation marks omitted) (alteration in original).

### 1. Violation of a Constitutional Right

The Fourth Amendment protects individuals against unreasonable searches and seizures.

U.S. Const. Amend. IV.  To be reasonable, a search or seizure must be carried out with a warrant

based on probable cause unless an exception applies.  *See United States v. Robertson*, 305 F.3d

164, 167 (3d Cir. 2002); *see also Katz v. United States*, 389 U.S. 347, 356-57 (1967)).  The Court

will assess whether each of the following four events are within the bounds of the Fourth

Amendment: (1) the initial traffic stop; (2) the frisk of Pierre's person; (3) the frisk of Pierre's

car; and (4) the duration and scope of the stop.

### A. Traffic Stop

Traffic stops are 'seizures' within the meaning of the Fourth Amendment.  *See United

States v. Delfin-Colina*, 464 F.3d 392, 396 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653

(1979)).  They fall within the framework for investigatory detentions articulated in *Terry v. Ohio*,

392 U.S. 1 (1968)).  Under the *Terry* exception to the warrant requirement, an officer "may,

consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has

reasonable, articulable suspicion that criminal activity is afoot."  *United States v. Brown*, 448

F.3d 239, 243 (3d Cir. 2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  "In *Whren

v. United States,* the Supreme Court established a bright-line rule that any technical violation of a

traffic code legitimizes a stop."  *United States v. Mosley*, 465 F.3d 249, 252 (3d Cir. 2006)

(citing *Whren*, 517 U.S. 806)).  But an officer must have "observed a traffic violation prior to

initiating the traffic stop."  *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012).

Pierre had a nonfunctioning rear brake light, *see* Stip. ¶ 9, which violates Pennsylvania traffic laws, *see* 75 Pa. C.S.A. § 4303(b) ("Every vehicle operated on a highway shall be equipped with a rear lighting system including, but not limited to, rear lamps, rear reflectors, stop lamps and license plate light").  The non-functioning light was the reason the officers pulled Pierre over.  *See* McColgan Depo. at 10:5-7.  Therefore, the traffic stop was lawful, *see Mosley*, 465 F.3d at 252; *Lewis*, 672 F.3d at 237, and the officers were permitted to detain Pierre "pending inquiry into [the] vehicular violation."  *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

### B.  Frisk of Pierre's Person

Once an officer has properly stopped a vehicle, the officer may "exercise reasonable superintendence over the car and its passengers," including by ordering the driver out of the vehicle.  *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977)).  If a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger," an officer may also frisk a person for weapons during an investigatory stop.  *Terry*, 392 U.S. at 27.  Such frisks are constitutional if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) (quoting *Terry*, 392 U.S. at 21).

Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."  *Delfin-Colina*, 464 F.3d at 396 (citation omitted).  "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether those historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion."  *Orlenas v. United States*, 517 U.S. 690, 696 (1996).

Courts look to the "totality of the circumstances, the whole picture" in determining whether there was reasonable suspicion. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Weight must be given "not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. The "totality of the circumstances includes an officer's knowledge, experience, and commonsense judgments about human behavior." *United States v. Robinson*, 305 F.3d at 167.

Defendants assert that Pierre's state of dress, his movements in the car, and his failure to follow commands, considered in their totality, would warrant a reasonable officer to fear for his safety and justify a weapons frisk. Each will be discussed in turn and considered in totality.

### a. State of Dress

When the officers approached Pierre, his pants were down near his knees, a situation both officers found strange. Pierre testified that his state of dress was not weird because he and his friends regularly drive home from the beach in just swim trunks or boxers. *See* Pierre Depo. at 49:15-17. But whether or not Pierre's state of dress was normal to him, the officers were entitled to rely on their experience and common sense to find driving home around midnight with one's pants down is objectively out of the norm and suspicious. *See Robinson*, 305 F.3d at 167.

### b. Movements in Car

Pierre's actions in the car raised Officer McColgan's suspicions that Pierre may have been concealing something on his person. After Officer McColgan told Pierre to take off his seatbelt and pull up his pants, Pierre reached over with his left hand to take his seatbelt off and then put his hand in his right pant leg. McColgan Footage at 00:46-00:48. This action prompted Officer McColgan to ask Pierre if he had just put something in his pants. *Id.* at 00:48-00:49.

Defendants cite Officer McColgan's question as evidence that he was concerned Pierre was concealing a weapon from the beginning of the traffic stop.  Def.'s Br. in Support at 8.  Both officers also testified that Pierre's movements influenced their decision in asking him to step out.  *See* McColgan Depo. at 10:11-20 (testifying that he asked Pierre to step out of the car because of how he was dressed and his actions reaching toward the floor where his pants were located); Hanley Depo. (noting that Pierre was making "a lot of movements within the vehicle" that suggested he "might have had some type of object . . . maybe that was a threat to [their] safety").

Pierre disputes that putting his left hand inside his pants would warrant a reasonable belief that he was armed and dangerous.  He explains that he was only trying to fix his pants as he had been ordered to do, and that his actions were consistent with someone taking off his pants.  P. Resp. to Def's SUMF at ¶ 17, 24. He also claims Officer McColgan knew that Pierre's left hand was empty because the officer, who had been shining a flashlight on Pierre's hands, saw that Pierre did not have anything in his left hand before he put his left hand in his pant leg.  *Id.* at ¶ 16. He also claims that Officer McColgan later understood that Pierre's pants were on backwards and that he was trying to put them back on the correct way, and that it is obvious that is all he was trying to do.  *Id.* at ¶ 17; *see also* P's Br. at 13.

But even if Pierre was merely reaching into his pants in order to take them off, turn them around, and put them on correctly, behavior that turns out to be innocent or has an innocent explanation does not necessarily negate reasonable suspicion.  *See, e.g., United States v. Graves*, 877 F.3d 494, 499 (3d Cir. 2017) (noting that the possibility of innocent explanations for conduct does not undermine an officer's determination at the time of the frisk).  Sticking one's arm far down one's pant leg is not the usual way to put on pants or even to take them off.  And because Pierre had moved his left arm to his right side to take off his seatbelt, it was not unreasonable for

Officer McColgan to be concerned that Pierre had acquired and was concealing a weapon with his left hand.  While the benefit of hindsight and of multiple views of the video footage shows that Pierre's left hand was, in fact, empty before he put it in his pants and that he was taking his pants off from the inside, Officer McColgan did not have this benefit.  The brief second Pierre's hand was visible after removing his seatbelt and before putting his hand in his pants would not necessarily have dispelled concern about why Pierre's hand was in his pant leg.  And although it does not appear that anything remained in Pierre's pant leg while he took off his pants and put them back on, it was reasonable under the circumstances to want to be sure given Pierre's strange behavior.  The proper inquiry is not what hindsight reveals, but whether the "facts available to the officer at the moment of the . . . search . . . warrant a man of reasonable caution in the belief that the action taken was appropriate," *Terry*, 392 U.S. at 21-22.  Here, they did.

Moreover, Pierre's responses to Officer McColgan's questioning did not allay the officers' suspicions about Pierre's behavior.  When Officer McColgan saw Pierre put his left hand into his right pant leg, Officer McColgan immediately said "[w]hat are you – you just try to put something in your pants?" *Id.* at 00:48-49.  Pierre's response was not to remove his hand from his pant leg and explain that he had put his hand there in order to take his pants off because they were on backwards.  Instead, he responded with an off-topic remark – and with his left arm still in his pant leg – by saying, "nah, nah, nah nah, actually, uh, I was talking to my friend on the phone and my friend told me . . ." *Id.* at 00:51-00:55.  And when Officer McColgan attempted to dispel some of his concerns or suspicions by asking Pierre whether they could agree that the situation they were in was strange, Pierre maintained that it was not.  *Id.* at 01:24-01:30.

For the reasons explained, Officer McColgan was reasonably concerned about Pierre's odd behavior and refusal to agree that being pulled over with one's pants backwards and pulled down was weird, and this concern factors into the totality of the circumstances.

### c.   Failure to Follow Commands

Finally, the government argues that Pierre questioned Officer McColgan's commands repeatedly and required repeated instructions before he fully complied, both in getting out of the car and then in walking to the back of the vehicle to be frisked. Pierre argues he was fully compliant but was confused by conflicting orders.

Viewing the evidence in the light of the bodycam, the evidence shows Pierre was compliant at the beginning of the stop. When Officer McColgan told Pierre to take his seatbelt off and pull his pants up, he did the first task and then started pulling his pants off in order to put them on and pull them up the right way. After Pierre put his pants on and the officer again ordered Pierre to "put your shoes on and step out," Pierre began to step out without his shoes. *Id.* at 01:44-46. After Officer McColgan corrected him, Pierre put one shoe on and began stepping out. *Id.* at 01:47-01:48. Officer McColgan then ordered him to put both of his shoes on.

At this point, Pierre became somewhat less compliant. Instead of immediately putting his second shoe on and getting out of the car, Pierre sat in the car and asked Officer McColgan twice why he was being asked to step out. *Id.* at 01:51-01:53. Pierre admits in his deposition testimony that he "hesitated to step out of the vehicle." Pierre Depo. at 103:18-19. After Pierre's questions, Officer McColgan then ordered Pierre "out" and "to the back," saying "I was trying to save you, but you won't listen," in reference to Pierre's shoes. McColgan Footage at 01:53-01:56. Pierre then said "no no no no," and finished putting on his right shoe, then got out of the car. *Id.* at 01:56-01:59.

Once out of the car, Pierre did not immediately walk to the back.  Defendants cite his delay in doing so as a justification for the frisk, but the video shows that as Pierre was getting out of the car, Sergeant Hanley joined them on the driver's side and was speaking to Pierre.  His initial delay in turning and walking to the back of the car cannot reasonably be construed as indicative of potential dangerousness because he was merely listening to an officer who was speaking to him.  After Officer McColgan tapped his arm, Pierre did turn and began moving.  As he did so, he continued to say he didn't understand why he was being asked to step out.  He also turned back to the front of the car to close his door, thereby failing to immediately follow orders to walk to the back.  At that point, Sergeant Hanley intervened and said she would get the door.

In sum, Pierre largely complied with Officer McColgan's orders at this point of the stop, though he periodically questioned the orders in a balking manner and at times briefly delayed compliance and had to be asked again.  This behavior will be considered in the totality of the circumstances.[5]

### 2.  Totality

At the time of the frisk, Officer McColgan knew the following.  It was nearly midnight in an area of town known for prostitution.  Pierre was wearing his pants backwards and around his thighs.  Pierre reached over to take off his seatbelt and then put his hand in his pants, where it remained for multiple seconds.  When asked whether Pierre was sticking something in his pants, Pierre replied that no, he had been on the phone with his friend, and his hand continued to remain

---

[5] Pierre testified that he was scared "of getting shot or anything or getting brutalized - - beat up" because he did not know why Officer McColgan was asking him to step out of the car.  Pierre Depo. at 103-104.  Even if fear motivated Pierre's actions, nothing in the video would have indicated that fear to the officers, and the reasonable suspicion analysis focuses on the facts available to the officers at the time of the stop.  *See Terry*, 392 U.S. at 21-22.  Therefore, Pierre's subjective motivations for his actions are immaterial to the court's analysis.

inside his pants.  Pierre's behavior led the officers to question whether Pierre was drunk or high, although Officer McColgan determined that he was not high.  Pierre then repeatedly questioned why he was being asked to step out of the car and marginally delayed doing so and moving to the back.  These circumstances would lead a reasonable officer to conclude that Pierre was potentially dangerous and may have been hiding a weapon.

In *United States v. Moorefield*, the Third Circuit considered whether a firearm recovered during a *Terry* frisk subsequent to a vehicle stop should be suppressed.  111 F.3d 10 (3d Cir. 1997).  The defendant in that case ignored the officer's instructions to remain in the car with his hands in the air.  *Id.* at 12.  He instead leaned back and shoved something down toward his waist, pushed his upper body through the window, and raised and lowered his hands several times.  *Id.* At the suppression hearing, the officer testified that the defendant's "behavior was consistent with the behavior of a person trying to conceal something."  *Id.* at 14.  The Third Circuit found it inconsequential that the officer "was not sure whether [the defendant] was attempting to hide narcotics or a firearm."  *Id.* at 14.  An officer need not be entirely sure that an individual is armed; rather, "a reasonably prudent man in the circumstances would [need to] be warranted in the belief that his safety or that of others was in danger."  *Id.* (quoting *Terry*, 392 U.S. at 27). The Court then concluded that the defendant's "behavior embodied the kind of specific, articulable facts" that warranted a weapons frisk of the individual.  *Id.*

As in *Moorefield*, Officer McColgan believed that Pierre may have been attempting to conceal something.  Whether Officer McColgan was sure that the item was a weapon is inconsequential as long as he reasonably suspected it was a possibility.  Pierre's potentially furtive action, in addition to Pierre's other odd behavior and questioning of the officers, and the time of night and the location of the stop, *see Illinois v. Wardlow*, 528 U.S. 119, 124, 129 (2000),

embody the "kind of specific, articulable facts that *Terry* contemplates" and warranted a frisk of Pierre's person.[6]

### C.  Frisk of Pierre's Car

Under the same *Terry* principles, officers may 'frisk' a passenger compartment of a vehicle were a weapon may be placed or hidden to prevent an individual from gaining immediate access to weapons. The officer must have a reasonable belief based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (citation and quotation marks omitted).  An officer may conduct a protective 'frisk' of the passenger compartment even when the occupants are outside the vehicle. *Id.* at 1051-52.  For the reasons explained in the previous section, the officers had reasonable suspicion that Pierre was armed and dangerous.  That reasonable suspicion justified a frisk of the passenger compartment of Pierre's vehicle, limited to those areas where a weapon may be hidden.  *See Long*, 463 U.S. at 1049.

Pierre argues that his car was not merely frisked but was subjected to a search that required probable cause.  But he has failed to raise a genuine issue of material fact that his car was searched beyond the bounds allowed under *Terry* as applied to vehicles in *Long*.  Pierre testified that Sergeant Hanley searched his glove compartment, center console, the passenger side of the car, the driver's side of the car, the back seat area, and the door panels.  Pierre Depo.

---

[6] Pierre claims that Defendants "searched plaintiff down from head to toe." Pierre SUMF ¶ 33. Because the footage shows he was merely briefly patted down, Pierre has failed to create a genuine dispute as to whether the search of his person exceeded the bounds of a *Terry* frisk. Nor does Pierre's contention that the officers believed they can search anyone they pull over create a genuine dispute of material fact. First, neither defendants nor their counsel espoused this view, and, even if they had, it would be irrelevant to the determination of whether the frisk in question was supported by reasonable suspicion.

at 19:07-19:24; 21:01-24:09; 27:08-10.  He claims Sergeant Hanley necessarily searched more than the console because she said there was registration, which was in the glove compartment.  P's SUMF ⁋ 35.  He also claims that the video footage supports his claim of a more expansive search than just the driver's side and center console.  P's Resp. to D's SUMF ⁋ 81.[7]

To be sure, neither body camera captured Sergeant Hanley's actions during the period that Officer McColgan's body camera was on the hood of Pierre's car.  But that period only lasted roughly 45 seconds.  *See* McColgan Footage 03:04-03:48.  To the extent that Pierre contends Sergeant Hanley searched more of the vehicle than the driver's side and center console during that time, the Court finds a genuine dispute.  However, the Court is skeptical that Sergeant Hanley could have searched all the locations Pierre contends she did in a 45-second period.  Regardless, the dispute is not material because officers can frisk the passenger compartment of a vehicle if they have reasonable suspicion that an individual "is dangerous and the suspect may gain immediate control of weapons."  *Long*, 463 U.S. 1032, 1049 (1983).  Pierre denies that the officers searched his trunk, Pierre Depo. at 27:8-10, and all the locations he claims were searched are within the passenger compartment.

Pierre also contends that Officer McColgan thoroughly searched the vehicle.  *See* Pl.'s SUMF at ¶ 34.  But because Officer McColgan was at the patrol car with Pierre during the 45 seconds that he was not wearing the body camera, this dispute is not genuine.  The only search Officer McColgan personally conducted was shining a flashlight into Pierre's car. *See* McColgan Footage at 04:05-04:08.  That was not an unlawful search.  *See United States v. Rickus*, 737 F.2d

---

[7] The footage he cites shows Sergeant Hanley leaning over to the center console with her shoulders barely inside the driver's side of the car, which does not prove that she was searching all over the car.  *See* McColgan Footage at 03:49-03:51.

360, 366 (3d Cir. 1984) (explaining that "the use of a flashlight to aid the officer's vision did not transform the observations justified under the 'plain view' doctrine into an illegal search").

In short, Pierre has failed to raise a genuine dispute of material fact as to the lawfulness of the search of his vehicle.

### D.  Scope and Duration of Traffic Stop

A traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.  In other words, the "scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality).  It must also "last no longer than is necessary to effectuate the purpose of the stop." *Id.*  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop[] and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (internal citations omitted).  An officer addresses the traffic violation by, for example, checking licenses, looking for warrants, and inspecting registration and proof of insurance.  *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citations omitted).  Taking precautions for the officer's safety is also "consistent with the mission of any traffic stop." *United States v. Garner*, 961 F.3d 264, 272 (3d Cir. 2020) (citations omitted).  If unrelated investigations "measurably extend the duration of the stop," then a "seizure becomes unlawful unless otherwise supported by reasonable suspicion or probable cause." *Garner*, 961 F.3d at 269 (citations omitted).  When officers have reasonable suspicion of other illegal activity to extend a stop, they must "verify or dispel [their] suspicion in a short period of time." *Royer*, 460 U.S. at 500 (citations omitted).

Pierre challenges both the duration and the scope of his detainment and argues that his detainment amounted to an arrest without probable cause.

### a.  Duration of Stop

The mission of Pierre's detention was a traffic stop, limited to his non-functioning taillight.  The officers were thus lawfully allowed to conduct traditional traffic-stop-related inquiries and attend to related safety concerns.  *See Green*, 897 F.3d at 179.  Here, as explained, frisking Pierre's person and car for weapons were lawful and safety-related under *Terry* and *Long* and were thus "consistent with the mission" of the traffic stop.  *See Garner*, 961 F.3d at 272.  The officers completed these safety frisks within the first five minutes of the stop, a not-unreasonable amount of time.  *See* McColgan Footage at 04:30.  Next, Officer McColgan entered and ran Pierre's information through his computer, which was also consistent with the mission of the stop and only took a few minutes.  *See id.* at 04:45-06:19; *see also Green*, 897 F.3d at 179. The officers decided to write Pierre a ticket for his traffic violation, which they were lawfully allowed to do.  *See* Stip. ¶ 9 (admitting Pierre had a nonfunctioning rear light); *id.* ¶¶ (admitting that Pierre was given a ticket for the light, which he unsuccessfully fought and was required to pay).  Writing the ticket took Sergeant Hanley roughly six minutes, also not an unreasonable amount of time.  And no checks unrelated to the mission of the traffic stop prolonged the stop. *See Rodriguez*, 575 U.S. at 355.  Therefore, the stop was reasonable in duration.

### b.  Scope

Pierre argues that the traffic stop amounted to an arrest, which required, but was not supported by, probable cause.  In considering whether an investigatory detention has escalated into an arrest, "the reasonableness of the intrusion is the touchstone."  *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995).  There is no "per se rule that . . . handcuffing [someone] constitutes an arrest, [but] doing so must be justified by the circumstances."  *Id.* at 1193-94; *see also Woodlen v. Jiminez*, 173 F. App'x 168, 171 (3d Cir. 2006) (considering the totality of the

circumstances to determine whether using handcuffs and other physical restraints transformed an investigatory seizure into a formal arrest) (citation omitted).  Similarly, detaining someone in the rear of a patrol car, if necessary for the officer to safely complete his investigation, does not necessarily transform a *Terry* stop into an arrest.  *See United States v. Persinger*, 284 F. App'x 885, 888-89 (3d Cir. 2008) (citing *Haynie v. Cty. of L.A.*, 339 F.3d 1071, 1077 (9th Cir. 2003)).  But where there is no basis to believe someone poses a security threat or may escape, using intrusive investigative methods may violate the Fourth Amendment.  *Baker*, 50 F.3d at 1193.

The Court looks to the totality of the circumstances to determine whether handcuffing Pierre and placing him in the patrol car was reasonable.  In addition to Pierre's previously discussed behavior, Pierre turned around, toward Officer McColgan, and lifted his arms off the hood after being ordered three times to put his hands on the hood of his trunk.  *See* McColgan Footage at 02:05-02:19.  Officer McColgan also testified that Pierre tensed up during the frisk, which Pierre disputes.  And when Officer McColgan asked if Pierre had urinated in the car after Pierre said that he had just used the restroom, Pierre did not initially respond.  Sergeant Hanley also testified that she agreed with the decision to handcuff him and place him in the car because they did not know his identity, what he was really doing, or whether he had weapons in the car.

Even accepting Pierre's contention that he did not tense up during the frisk and that he denied urinating in his car, handcuffing and placing Pierre in the patrol car while they frisked his vehicle for weapons and searched for warrants was reasonable under the circumstances.  A reasonable officer would fear for his safety from an inexplicably pants-less individual who took several seconds to deny urinating in his car and who repeatedly questioned the officers' orders and at one point expressly flouted them by turning toward an officer when he had been ordered to keep his hands on the trunk.  Pierre argues that the justifications Sergeant Hanley gave in her

testimony could have applied to anyone who was pulled over, but not everyone who has committed a traffic violation exhibits the same behavior and state of dress as Pierre here.

Pierre also claims that the decision was based not on fear for the officers' safety, but on their belief that Pierre was 'weird' for driving without pants.  He cites to instances during the stop when the officers mentioned his state of dress, said they ordered him out of the car because he was driving without pants, or called him 'weird' during the stop.  These facts do not create a genuine dispute for two reasons.  First, the Court must determine whether the officers' actions were reasonable without regard to their subjective motivations.  *See Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) ("The test is [whether]. . .  the officers' actions are objectively reasonable . . . without regard to their underlying intent or motivations") (internal quotation marks omitted).  Second, stating that Pierre is a 'weirdo,' that not wearing pants is 'weird,' or that Pierre cannot drive around without pants on is not mutually exclusive with believing Pierre posed a safety risk.  Nor would a reasonable officer concerned for his safety necessarily explain the nuances of his concern to the person inspiring it.  Finally, their reasonable concern about Pierre's behavior did not necessarily subside once Officer McColgan's frisk of Pierre's person revealed no weapons.  Because of his behavior during the stop as reflected in the video, Pierre has not shown a genuine dispute of fact that handcuffing him and placing him in the rear of the patrol car while the officers continued with the mission of the traffic stop escalated the stop into a full-blown arrest.

Next, the Court considers whether Pierre's continued detainment in the patrol car until the end of the traffic stop was reasonable under the circumstances.  In addition to the circumstances related above, Pierre's behavior while Officer McColgan attempted to handcuff him reasonably raised the officer's concerns.  The Court views whether Pierre "threw an arm" at Officer McColgan in the light most favorable to Pierre for purposes of this motion.  But even so,

the video footage shows that Pierre was noncompliant in a way that would lead a reasonable officer to believe physical restraints were necessary and that Pierre posed a safety risk.

Pierre failed to follow all orders at the back of his car.  After Officer McColgan told Pierre to put his hands behind his back, Pierre turned slightly toward Officer Pierre, lifted his hands slightly from the trunk, and asked why he was being arrested. When the officers told him that he was not under arrest, but under investigation, Pierre remained facing Officer McColgan instead of following the directive to put his hands behind his back. When Officer McColgan took Pierre's right wrist in his left hand, guiding it toward Pierre's back in order to handcuff him, Pierre instead turned further toward Officer McColgan and began pulling his arm away.  *See* McColgan Footage at 02:42-02:47.[8]  Both officers responded to this action: Officer McColgan asked if he would need to 'slam' Pierre, and Sergeant Hanley moved closer saying "yo, dude." This failure to comply with orders – including by physically pulling his arm away – would lead a reasonable officer to believe that physical restraints were necessary for the duration of the traffic stop.  Additionally, Officer McColgan testified that he had been in multiple fights with civilians in Kensington and believed based on Pierre's behavior that Pierre would attempt to fight him. McColgan Depo. at 15:22-16:8.

Pierre raises a few arguments in response, none of which are availing.  First, he argues that alleged safety concerns based on the above were negated because Pierre said, "okay okay okay" and submitted to being handcuffed once Officer McColgan threatened to body slam him for not submitting to being handcuffed.  But a submission following non-compliant or bizarre behavior does not negate the possibility that non-compliant or potentially aggressive behavior

---

[8] Pierre disputes pulling his arm away from Officer McColgan, *see* ECF No. 15-1 at ¶ 72, but the video unequivocally shows this occurred.

could still occur, and precautions to guard against that reasonably potential behavior is not unreasonable.  P's Br. in Resp. at 9.

Second, Pierre argues that there was no justification to detain him because the searches of his person and car revealed no weapons and a warrant search revealed no outstanding warrants. Because that knowledge was not acquired before the last few minutes of his detention, the Court construes this argument to be that Pierre's continued detention while Sergeant Hanley wrote him a traffic ticket amounted to an arrest.  Sergeant Hanley testified that they kept him in the patrol car because, given his prior behavior, they did not feel it safe to leave him on the sidewalk with only one officer while the other completed paperwork.  Hanley Depo. at 33:18-34:1.  Based on Pierre's behavior, this decision and the ensuing detention while she wrote him a ticket was reasonable under the circumstances.

Because detaining Pierre in the rear of the patrol vehicle was reasonable under the circumstances as depicted in the video, Pierre has failed to raise a genuine dispute of material fact that could support a conclusion that he was arrested.

In sum, because there is no genuine dispute of material fact that the officers violated Pierre's constitutional rights, summary judgment is appropriate on Pierre's § 1983 claim.

### 3.  Clear Establishment of the Right

Since Officer McColgan and Sergeant Hanley did not violate Pierre's constitutional rights, the analysis may end.  But even if Pierre had shown a genuine dispute of material fact as to whether the officers violated his rights, qualified immunity would still apply because Pierre has not shown that those rights were clearly established in the context of his stop.

For a right to be clearly established, it must be true that, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what

he doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citation omitted).  Courts "do not charge officials with such an understanding unless existing precedent has placed the statutory or constitutional question beyond debate." *Williams v. City of York*, 967 F.3d 252, 259 (3d Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  This does not require a case "directly on point," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal citations omitted), but "settled law, *Wesby*, 138 S. Ct. at 590, must squarely govern[] the specific facts at issue." *James v. New Jersey State Police*, 957 F.3d 165, 169 (3d Cir. 2020).

In the majority of cases, a plaintiff "must show that a right is clearly established because the violative nature of *particular* conduct [was] clearly established." *James*, 957 F.3d at 169 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)).  Courts must "examine an official's 'particular conduct'" in the "specific context of the case" when it determines the clear establishment of the allegedly violated right.  *Williams*, 967 F.3d at 259 (internal citations omitted); *see also Millenix v. Luna*, 577 U.S. 7, 12 (2015) (explaining that specificity is "especially important" in the context of alleged Fourth Amendment violations because it may be difficult for an officer to determine how the legal doctrines apply to the situation before him).  The Supreme Court has "stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."  *Wesby*, 138 S. Ct. at 590 (internal quotation marks and citations omitted).  Clearly established rights derive from binding Supreme Court or Third Circuit precedent, or a "robust consensus of cases of persuasive authority in the Courts of Appeals."  *James*, 957 F.3d at 170.

The Court "start[s] by defining the circumstances with which [the officers] w[ere] confronted."  *Wesby*, 138 S. Ct. at 590.  As explained, the officers were confronted by an

individual not wearing pants and who stuck his hand in his pants.  He then failed to acknowledge the strangeness of the situation, failed to deny urinating in his car for several seconds, failed to keep his hands on the hood as directed, and pulled his arm away from an officer attempting to handcuff him.  Pierre has not identified a case where an officer confronted with remotely similar circumstances as the officers here was held to have violated the Fourth Amendment.

In arguing that the officers violated clearly established law, Pierre cites only a district court case from 2004.  Pl. Br. at 15 (citing *Brittingham v. Anhorn*, 2004 WL 1878239 (E.D. Pa. Aug. 20, 2004)).  A district court case is insufficient to show a right is clearly established.  *See Williams*, 967 F.3d at 259.  Moreover, it involved a factually distinct situation where there was no immediate threat to the safety of the officers or others, which as explained above was not the case here.  And finally, the right held to be clearly established in that case – "the Fourth Amendment prohibition against the use of force which exceeds that required by the circumstances" – is not sufficiently specific under modern qualified immunity jurisprudence. *See, e.g.*, *al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality"); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (explaining that settled law must "squarely govern[] the specific facts at issue"); *El*, 975 F.3d at 338 ("[T]he right must be defined with specificity.").  Nor do the other cases cited in other sections of Pierre's brief indicate similar circumstances to those the officers confronted here.  Because Pierre has not pointed to any Supreme Court, Third Circuit, or a "robust consensus" of out-of-circuit caselaw addressing similar circumstances – and nor has the Court found any – the officers are entitled to qualified immunity.

Because Officer McColgan and Sergeant Hanley did not violate Pierre's clearly established constitutional rights, the Court will grant summary judgment to Defendants on Pierre's § 1983 claim and dismiss that claim with prejudice.

**B.  False Arrest and False Imprisonment**

Pierre has also sued Officer McColgan and Sergeant Hanley for state-law tort claims of false arrest and false imprisonment.  When the "claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995).  Because the elements of and material facts to the state law claims are closely related to those of the federal claim, the Court will consider the state-law claims as a matter of judicial economy and fairness to the parties.

Under the Political Subdivision Tort Claims Act, 42 Pa. C.S. § 8542 et. seq., municipal employees are immune from suit for intentional torts unless their conduct constituted a "crime, actual fraud, actual malice or willful misconduct."  42 Pa. C.S. § 8550; *see also Renk v. City of Pittsburgh*, 641 A.2d 289, 293-94 (Pa. 1994).  To succeed on claims relating to police conduct, a court must find "not only that the [officers] intended to commit the acts that [they are] accused of carrying out, but also that [the Officers] understood that the actions were illegal and chose to take the actions anyway."  *Boardman v. City of Phila.*, 661 F. App'x 183, 188 (3d Cir. 2016) (citations omitted).

Officer McColgan and Sergeant Hanley are accused of false arrest and false imprisonment.  False arrest under Pennsylvania law is an arrest made without probable cause. *McGriff v. Vidovich*, 699 A.2d 797, 799 n.3 (Pa. Commw. 1997).  False imprisonment is the

unlawful detention of another person. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). In the context of law enforcement where "defendant purports to act for the purpose of securing the administration of the law without actual legal justification, 'false arrest' is synonymous with 'false imprisonment.'" *Gagliardi v. Lynn*, 285 A.2d 109, 111 (Pa. 1971) (internal citation omitted).

Central to liability for these torts is the question of whether Pierre was arrested or imprisoned. "When an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car" and handcuff them during the detention for their safety, and doing so does not necessarily constitute an arrest. *Commonwealth v. Rosas*, 875 A.2d 341, 348 (Pa. Super. 2005) (internal citations omitted); *see also Commonwealth v. Revere*, 888 A.2d 694, 707 (Pa. 2005) (holding that certain exigencies including officer safety may make it reasonable to place a suspect in a patrol car and transport him a distance without transforming the investigatory detention into an arrest). Officer McColgan's and Sergeant Hanley's actions, therefore, did not automatically constitute arrest under Pennsylvania law.

Pennsylvania defines arrest as an act "that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest." *Commonwealth v. Butler*, 729 A.2d 1134, 1137 (Pa. Super. 1999). This is an objective test, "viewed in the light of the reasonable impression conveyed to the person subjected to the seizure." *Id.* In *Commonwealth v. Rosas*, for example, a trooper had stopped a man who could not produce any identification or registration, who was driving a car registered to an out-of-state woman, and about whom the trooper had obtained information indicating he might be a fugitive. *Rosas*, 875 A.2d at 344-45. The trooper placed him in handcuffs, telling him that he was being

detained on suspicion of being a deported felon, and continued to investigate the individual's identity. *Id.* In determining whether the handcuffs turned the detention into an arrest, the Court "balance[d] all the circumstances of the detention, and consider[ed] the information both available to and unknown by [the officer]," and the fact that the officer had explained the circumstances to the suspect, and concluded that the suspect did not have a reasonable belief that he was under a custodial arrest. *Id.* at 349. Therefore, the Court concluded that the suspect was not under arrest.

As in *Rosas*, the circumstances here did not reasonably lead Pierre to believe he was under arrest. Officer McColgan and Sergeant both told him he was not under arrest but was under investigation. *See* McColgan Footage at 02:39-02:45. Pierre was only detained while the officers investigated his identity and whether he was armed and dangerous, and while they wrote him a traffic ticket. Those activities were reasonable under the analysis above. And when Pierre said it was okay to not wear pants because it was his car, Officer McColgan said "okay, and then you'll be out of here." McColgan Footage at 05-13-05:16. Under the totality of these circumstances, Pierre did not have a reasonable belief that he was under arrest. Therefore, the detainment did not constitute an arrest and Pierre has not shown a genuine dispute of material fact as to a necessary element of his state law tort claims. So, regardless of whether the officers' conduct could be viewed as willful misconduct, his state-law claims must fail.

## IV.   CONCLUSION

Because no genuine disputes of material fact exist and the defendants are entitled to judgment as a matter of law, the Court will grant summary judgment to Defendants on all Plaintiff's claims.